UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DANIEL PERKO<br>Twinsburg, OH 44067;<br><br>KEVIN KINCH<br>Twinsburg, OH 44067; and<br><br>PRECAST SERVICES<br>Twinsburg, OH 44087<br><br>on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br>a Delaware corporation,<br>c/o CT Corp. Systems, Statutory Agent<br>1300 E. 9th St.<br>Cleveland, OH 44114<br><br>Defendant. | CLASS ACTION COMPLAINT WITH JURY DEMAND |

## NATURE OF THIS ACTION

1. Plaintiffs bring this proposed class action on behalf of both an Ohio and nationwide class of persons and entities who purchased or leased vehicles manufactured by Ford Motor Company ("Defendant" or "Ford") that are covered by Defendant's Technical Service Bulletin 08-7-6 ("Covered Vehicles").

2. Ford's Technical Service Bulletin 08-7-6 ("TSB 08-7-6"), titled "Ignition System, Spark Plug Removal Instructions," contains detailed instructions as to how to remove defective spark plugs from the Covered Vehicles, all of which were manufactured by Ford. TSB 08-7-6 is attached as Exhibit 1.

{00023963; 1}

3. Ford manufactured and sold the Covered Vehicles with defective spark plugs and related engine defects. Each of the millions of Covered Vehicles at issue has 8 defective plugs and related engine defects.

4. Plaintiffs' use of the terms "defective spark plugs," "defective plugs," and "plugs" throughout this Complaint includes the ignition system issues involving the spark plugs, their positioning and fit in the engine block and related cylinders, and resulting sludge buildup.

5. These defects have diminished the value of the Covered Vehicles. The defects were and are latent in nature because they are not obvious or ascertainable upon reasonable examination.

6. When a mechanic or technician tries to remove these defective plugs in the normal course of use and maintenance, the mechanic or technician must follow the extraordinarily time-consuming and expensive process required by Ford's TSB 08-7-6. There would be no need for this TSB, and the resulting related expenses incurred by the Classes, if the plugs at issue and the related engines were not defective.

7. Yet, even if the process laid out in TSB 08-7-6 is followed, the defective plugs still often break—adding further to the replacement or repair expense. For example, the removal of each broken spark plug adds about $200 to the already expensive removal process.

8. Unlike other plugs, the defective plugs in the Covered Vehicles have a multi-piece design. The bottom piece is called the "ground electrode shield." The ground electrode shield is a separate piece from the rest of the spark plug and is unusually long when compared to other plugs. The ground electrode shield is "crimped" to the remainder of the spark plug. Over time, carbon sludge accumulates around the plugs. This sludge acts like a super-adhesive, essentially locking the plugs in place as the plugs adhere to the sides of the engine cylinders. To

remove the plugs, exceptional efforts must be exerted as required by TSB 08-7-6. This greatly increases the time necessary to accomplish the job and greatly increases the expense. During the removal process, often some or all of the defective plugs break or snap, leaving a substantial portion of the defective plug in the cylinder head, further increasing the expense. When a plug snaps or breaks, it often does so at the point where the separate ground electrode shield is joined to the main part of the plug.

9. Once broken, special tools, equipment, and cleaners are needed to take out the broken partial plugs. This dramatically increases the time necessary to accomplish the job, foisting substantial additional expense upon the Classes, and further diminishing the value of their Covered Vehicles.

10. At all relevant times, Ford knew or should have known of the defects.

11. Ford's defective plugs and related engine defects are so pervasive that one automotive tool maker markets and sells the "Ford Broken Spark Plug Remover." A description of the Lisle Ford Broken Spark Plug Remover is attached as Exhibit 2.

12. Although Ford placed these defective plugs in the Covered Vehicles and designed, engineered, and manufactured related components including engine defects, Ford refuses to cover the substantial additional costs related to removing the defective plugs and refuses to provide notice to the owners and lessors of these Covered Vehicles.

13. Accordingly, this suit and the class certification sought are necessary to vindicate the rights of Plaintiffs and the proposed Classes.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2) because the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and this is a class action in which the members of the Classes and Ford are citizens of different states.

15. Venue is proper in this judicial district under 28 U.S.C. §1391 because Ford does business throughout this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. At all pertinent times, Ford was and is in the business of manufacturing, marketing, advertising, distributing, and selling Covered Vehicles, throughout this judicial district, Ohio, and the nation, by and through various authorized dealers. The Covered Vehicles that form the basis of this Complaint were placed in the stream of commerce by Ford.

## PARTIES

16. Plaintiffs Daniel Perko and Kevin Kinch are Ohio citizens residing in Summit County, Ohio.

17. Plaintiff Precast Services is an Ohio corporation with its principal place of business in Summit County, Ohio.

18. Ford is a Delaware corporation with its principal place of business in Dearborn, Michigan.

## FACTUAL ALLEGATIONS

19. Precast Services ("Precast") purchased multiple new F-150 trucks covered by TSB 08-7-6.

20. Each of these F-150 trucks contains one of the 3-valve engines listed in TSB 08-7-6 and contains the defective plugs. Each of these trucks is a Covered Vehicle.

21. Precast has taken several of its Covered Vehicles to a Ford dealership for routine maintenance during which new plugs were installed. As to each of these Covered Vehicles, the defective plugs were seized or locked to the engine's cylinder heads. As to each of these Covered Vehicles, the mechanic followed the procedures required by TSB 08-7-6 to remove the plugs. Because of the defective plugs and related engine defects, the expense paid by Precast to remove and replace these plugs from its Covered Vehicles was substantially higher than it would have been if these defects were not present.

22. An employee at the Ford dealership told a Precast employee that the defective spark plugs are a common problem that the dealership sees all the time with Ford's 3-valve engines. This employee also indicated that a carbon-based sludge builds up around and on the plugs and that over time, the sludge acts like a super-adhesive, essentially locking the plugs in place.

23. According to this Ford dealership employee, while the dealership follows the process required by TSB 08-7-6 for each Covered Vehicle, the dealership expects some of the plugs to break. The dealership's standard charge to remove one broken plug from a Covered Vehicle is $200.

24. In at least one instance involving a Precast Covered Vehicle, multiple plugs broke during the TSB 08-7-06 removal process, further raising the expense.

25. Further, in at least one instance, the Precast Covered Vehicle was within the express warranty coverage at the time the plugs were removed.

26. The dealership's standard charge to remove and replace all 8 plugs from a Covered Vehicle (assuming no plugs break during the TSB removal process) is nearly $300. This

is higher than the cost to remove plugs from other vehicles because the defects in the plugs in Covered Vehicles require extra time, care, and expense to remove as required by TSB 08-7-6.

27. As of the date of filing this Complaint, because of the defects at issue, Precast has paid many hundreds of extra dollars to remove the defective plugs from its Covered Vehicles. These extra charges were incurred both because the cost to remove plugs that do not break is higher than if the plugs were not defective, and because some plugs have broken, causing additional extra charges for each broken plug.

28. Ford refused to cover under any warranty any of these extra expenses caused by the defects.

29. Were it not for the defective plugs present in its Covered Vehicle, Precast would not have incurred these additional hundreds of dollars in expenses to remove the defective plugs.

30. Because of Ford's engine design, the same (albeit new) defective plugs were installed in Precast's Covered Vehicles.

31. Daniel Perko purchased on or around March 26, 2006, and remains the owner of, a new 2006 Ford Mustang.

32. Mr. Perko's 2006 Ford Mustang has the 4.6 liter 3-valve engine listed in TSB 08-7-6 and has the defective plugs and the related engine defects.

33. The 2006 Ford Mustang purchased by Mr. Perko is a Covered Vehicle.

34. Kevin Kinch purchased a 2004 F-150 pick up truck in August, 2006.

35. Mr. Kinch's F-150 has the 5.4 liter 3-valve engine listed in TSB 08-7-6 and has the defective plugs and the related engine defects.

36. The 2004 Ford F-150 purchased by Mr. Kinch is a Covered Vehicle.

37. On or around October 16, 2009 Mr. Kinch took his Covered Vehicle to a Ford Dealership for routine maintenance during which new plugs were to be installed. Because of Ford's defective plugs and related engine defects, the original plugs were seized or locked into to the engine's cylinder heads, preventing the mechanic from doing routine plug removal. Because of the defective plugs and related engine defects, it took three days to complete the work on Mr. Kinch's Covered Vehicle.

38. The mechanic was forced to spend extraordinary time and use additional materials and equipment to remove the original defective plugs from Mr. Kinch's Covered Vehicle, as required by Ford's TSB 08-7-6. This added substantial additional expense to this otherwise routine procedure.

39. Were it not for the defective plugs and related engine defects present in his Covered Vehicle, Mr. Kinch would not have incurred these additional expenses to remove the defective plugs.

40. Because of Ford's engine design, the same (albeit new) defective plugs were installed in Mr. Kinch's Covered Vehicle.

41. Ford designed, engineered, and manufactured all of the Covered Vehicles, each of which has the same defective plugs and related engine defects.

42. Ford is well aware that all Covered Vehicles have these defective plugs and related engine defects. Ford's initial response to this defect was to issue Technical Service Bulletin 06-5- 9 (TSB 06-5-9). According to TSB 06-5-9, "Some 2004 F-150 vehicles with a 5.4L 3-valve engine may experience difficulty with spark plug removal which may cause damage to the spark plug and leave part of the spark plug in the cylinder head."

43. TSB 06-5-9 then described in detail multiple special steps and tools that the mechanic must use to remove the defective plugs. TSB 06-5-9 goes on to declare that "it is necessary to adhere exactly to this procedure before removal is attempted."

44. Were it not for the fact that Ford manufactured these Covered Vehicles with these defective plugs and related engine defects, the additional multiple steps and tools required to remove these defective plugs would not be necessary and the Classes would not have to pay the additional hundreds of dollars each time new plugs are installed.

45. In addition to the Ford Mustangs and F-150 trucks covered by TSB 06-5-9, Ford placed the defective plugs in many more of its models. These other models experienced (and continue to experience) the same problem.

46. Accordingly, Ford issued TSB 08-7-6 in April 2008. Like its predecessor bulletins, TSB 08-7-6 describes in detail multiple special steps and tools required to remove the defective plugs. Once again, TSB 08-7-6 declares that "it is necessary to adhere exactly to this procedure before removal is attempted."

47. According to TSB 08-7-6, the following Covered Vehicles have the defective plugs and related engine defects:

   a. 2005-2008 Mustang
   b. 2004-2008 F-150
   c. 2005-2008 Expedition, F-Super Duty
   d. 2006-2008 Explorer
   e. F-53 Motorhome Chassis
   f. 2007-2008 Explorer Sport Trac
   g. 2005-2008 Navigator
   h. 2006-2008 Mark LT
   i. 2006-2008 Mountaineer

48. According to TSB 08-7-6, each Covered Vehicle has one of the following engines:

a. 5.4 Liter 3-Valve built before October 9, 2007;
   b. 6.8 Liter 3-Valve built before October 9, 2007; or
   c. 4.6 Liter 3-Valve built before November 30, 2007.

49. Were it not for the fact that Ford manufactured these Covered Vehicles with these defective plugs and related engine defects, the additional multiple steps and tools required to remove the defective plugs would not be necessary, and the Classes would not have to pay the additional hundreds of dollars each time new plugs are installed

50. Each Class member has been damaged by Ford's conduct, as they have been forced to pay, or will pay, hundreds of additional dollars to remove the defective plugs and their Covered Vehicle's value has been diminished because of these defects.

## **CLASS ACTION ALLEGATIONS**

51. Plaintiffs bring this action on behalf of themselves and all others similarly situated, as members of the proposed Classes, under Civil Rule 23. The requirements of Rule 23 subparts 23(a) and 23(b)(2) and (3) are met with respect to the Class defined below.

52. Plaintiffs seek to represent the following two Classes:

> OHIO CLASS – During the fullest period allowed by law, all persons and entities in the State of Ohio that purchased or leased a Covered Vehicle manufactured by Ford Motor Company. Covered Vehicle is defined to include those vehicles listed in Ford's Technical Service Bulletin 08-7-6.

> NATIONWIDE CLASS – During the fullest period allowed by law, all persons and entities nationwide that purchased or leased a Covered Vehicle manufactured by Ford Motor Company. Covered Vehicle is defined to include those vehicles listed in Ford's Technical Service Bulletin 08-7-6.

> The Classes exclude: (1) Ford, any entity in which Ford has a controlling interest, and its legal representatives, officers, directors, employees, assigns, and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate

family; (3) Class Counsel; and (4) claims for personal injury, wrongful death, and/or emotional distress.[1]

53. Plaintiffs seek only economic damages on behalf of all members of the Classes. Plaintiffs disclaim any intent to request any recovery for personal injuries suffered or which may be suffered by any member of the Classes.

54. Numerosity. Members of the Classes are so numerous that individual joinder of all members is impracticable. Ford sold over 2,000,000 F-150s nationwide during the relevant time period. Most if not all of these F-150s have the relevant engines and plugs at issue. F-150s are just one of the many Ford models covered by TSB 08-7-6.

55. Plaintiffs are members of the Classes. As the above paragraphs demonstrate, Plaintiffs are members of the Classes as defined above.

56. Existence of Common Questions of Law and Fact. Common questions of law and fact exist as to all members of the Classes. These common legal and factual questions include:

   a) whether each Covered Vehicle was sold with defective plugs and related engine defects;

   b) whether the defects reduce the value of the Covered Vehicles;

   c) whether Ford's express warranty covers the latent defects;

   d) whether Ford breached its warranties made to Plaintiffs and the Classes;

   e) whether Ford negligently designed/engineered/manufactured the plugs and related engines;

   f) whether Ford knew that the Covered Vehicles are defective;

   g) whether Ford concealed the defects; and

---

[1] Plaintiff reserves the right to amend these class definitions at any time prior to trial.

h) whether Plaintiffs and the members of the Classes have suffered damages as a result of the conduct alleged herein, and if so, the measure of such damage.

57. **Typicality.** Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs and all members of the Classes have a Covered Vehicle that has the same defective plugs and engine defects.

58. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs are adequate representatives because their interests do not conflict with the interests of the members of the Classes. Further, Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automotive defect class action litigation against Ford, and Plaintiffs intend to prosecute this action vigorously. The interests of the members of the Classes will be fairly and adequately protected.

59. **Rule 23(b)(3) Predominance and Superiority.** Questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members and a class action is superior to other available means for fairly and efficiently adjudicating the controversy. In this regard, the Class members' interests in individually controlling the prosecution of separate actions is low given the magnitude, burden, and expense of individual prosecutions against a corporation as large as Ford. Further, Plaintiffs and their Counsel are not aware of any litigation concerning this controversy already begun by members of the Classes. And, it is desirable to concentrate this litigation in this forum to avoid burdening the courts with individual lawsuits. Individualized litigation presents a potential for inconsistent or contradictory judgments, and also increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of this case. By contrast, the class action procedure here will have no management difficulties. Ford's records and the records

available publicly will easily identify the members of the Classes. And, because this defect is common to all Covered Vehicles, the same common documents and testimony will be used to prove the Plaintiffs' claims as well as the claims of both Classes. Finally, proceeding as a class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

60. **Rule 23(b)(2) Certification.** Certification is also appropriate under Rule 23(b)(2) because Ford has acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

## TOLLING AND ESTOPPEL

61. Plaintiffs' cause of action did not arise until Plaintiffs discovered, or by the exercise of reasonable diligence should have discovered, that they were injured by Ford's wrongful conduct. Because Ford concealed the fact that the Covered Vehicles have the defective plugs and related engine defects, Plaintiffs did not discover and could not have discovered this fact through reasonable diligence until after they attempted to remove the defective plugs.

62. The applicable statutes of limitations have been tolled by Ford's knowing and active concealment of the material fact that the Covered Vehicles have the defective plugs and related engine defects. Ford intentionally kept Plaintiffs and the members of the Classes ignorant of vital information essential to pursue their claims, without any fault or lack of diligence on the part of Plaintiffs and the members of the Classes. Plaintiffs and the members of the Classes could not reasonably have discovered the fact that Covered Vehicles have the defective plugs and related engine defects until after they attempted to remove the defective plugs.

63. Ford was and is under a continuous duty to disclose to Plaintiffs and the members of the Classes the true character, quality, and nature of the Covered Vehicles. At all relevant times, and continuing to this day, Ford knowingly, affirmatively, and actively misrepresented and concealed the true character, quality, and nature of the Covered Vehicles. Plaintiffs and the members of the Classes reasonably and in good faith relied upon Ford's affirmative misrepresentations and knowing, affirmative, and/or active concealment. Based on the foregoing, Ford is estopped from relying on any statutes of limitation in defense of this action.

## **BREACH OF EXPRESS WARRANTY**
## (OHIO CLASS AND NATIONWIDE CLASS)

64. Plaintiffs incorporate paragraphs 1-63 into this breach of express warranty claim.

65. When Plaintiffs Precast and Perko and the members of the Classes purchased their Covered Vehicles (either as new vehicles or as a used vehicle with remaining warranty coverage), Ford expressly warranted under its 'Bumper to Bumper" warranty that it "will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship." Ford went on to promise that it would pay for all repairs and parts to replace defective parts, including the defective plugs.

66. Ford breached its express warranty (and continues to breach this express warranty) because it did not (and does not) cover the expenses associated with replacing the defective plugs in Plaintiffs' and the Classes' Covered Vehicles. Ford further breached this express warranty because the same defective plugs were placed in the Covered Vehicles once the factory-supplied plugs were removed.

67. Accordingly, Plaintiffs and Class members suffered damages caused by Ford's breach of the express warranty and are entitled to recover damages, including but not limited to diminution of value.

## NEGLIGENT DESIGN/ENGINEERING/MANUFACTURING
## (OHIO CLASS)

68. Plaintiffs incorporate paragraphs 1-63 into this negligent design, engineering, and manufacturing claim.

69. Ford owed Plaintiffs and the Ohio Class a non-delegable duty to exercise ordinary and reasonable care to properly design, engineer, and manufacture the plugs and engines against foreseeable hazards and malfunctions and to design, engineer and manufacture the plugs and engines so they would function normally, including the ability to remove the plugs from the engine without incurring major unanticipated expense. Ford also owes a continuing duty to notify Plaintiffs and the Ohio Class of the problem at issue and to repair the defects.

70. The foreseeable hazards and malfunctions include, but are not limited to, the difficulty and extra expense of removing plugs that become stuck to the engine cylinder and the impracticability and dysfunction of a multi-piece spark plug design (joined by crimping) that breaks during the removal process, thereby adding additional expenses.

71. Plaintiffs and members of the Ohio Class were not aware of the plug and engine defects described above and their latent shortcomings, or the likelihood of damage therefrom arising in the normal use of Covered Vehicles.

72. There existed at al relevant times alternative spark plug and related component designs and engineering which were both technically and economically feasible. Further, any alleged benefits associated with Ford's defective designs are vastly outweighed by the real risks which include the added expenses foisted upon the Plaintiffs and the Ohio Class by the defects.

73. Ford did not design, engineer, or manufacture the Covered Vehicles with reasonable care.

74. As to Ford's manufacture of the Covered Vehicles, the defective plugs and related engine defects differed in a material way from Ford's design specifications.

75. Covered Vehicles were defective as herein alleged at the time they left Ford's factories.

76. Ford breached its duty owed to Plaintiffs and to the Ohio Class to design, manufacture, and engineer the plugs against such foreseeable hazards and malfunctions.

77. As a direct and proximate result of this breach, Plaintiffs and the members of the Ohio Class have suffered damages.

78. Accordingly, Plaintiffs and the Ohio Class are entitled to recover appropriate damages including, but not limited to diminution of value and repairing their Covered Vehicles with non-defective plugs, free of any charge.

## BREACH OF IMPLIED WARRANTY IN TORT (Tortious Breach of Warranty) (OHIO CLASS)

79. Plaintiffs incorporate paragraphs 1-63 into this tortious breach of warranty claim.

80. Ford impliedly warranted that the Covered Vehicles were of good and merchantable quality—fit and safe for their ordinary intended use.

81. There were defects in the Covered Vehicles manufactured, distributed, and/or sold by Ford to middlemen who then resold the Covered Vehicles to the Plaintiffs and the Ohio Class. These defects include the defective spark plugs and related engine defects described previously.

82. These defects existed at the time the Covered Vehicles left Ford's manufacturing facilities and at the time they were sold to the Plaintiffs and the Ohio Class.

83. Those defects were the direct and proximate cause of injury to the Plaintiffs and the Ohio Class.

84. The defects render the Covered Vehicles unfit for their intended purpose (which includes but is not limited to spark plug replacement without extraordinary expense), and not of merchantable quality.

85. As a direct and proximate result of Ford's warranty breach, Plaintiffs and the Ohio Class were caused to suffer loss attributable to the decreased value of their Covered Vehicles, and consequential damages— economic losses sustained by the purchase or lease of the Covered Vehicles—and Plaintiffs and the Ohio Class will have to spend monies to repair and/or replace their Covered Vehicles.

## **DEMAND**

WHEREFORE, Plaintiffs, on his their own behalf and on behalf of the Class, respectfully request judgment against Ford:

a) certifying the Classes and appointing Plaintiffs and their counsel to represent the Classes;

b) ordering Ford to provide notice to the Classes of the defective plugs and related engine defects;

c) ordering Ford to promptly repair and/or replace all defective plugs and related engine defects;

d) awarding damages which include but are not limited to diminution of value;

e) awarding Plaintiffs and the Classes pre-judgment and post-judgment interest; and

f) awarding such other and further relief as this Court may deem just and proper.

Respectfully submitted,

*[signature]*

Murdock Goldenberg Schneider & Groh, LPA
Jeffrey S. Goldenberg (0063771)
Todd Naylor (0068388)
35 East Seventh Street, Suite 600
Cincinnati OH 45202-2012
Telephone: (513) 345-8291
Facsimile: (513) 345-8294
jgoldenberg@mgsglaw.com
tnaylor@mgsglaw.com
**Trial Attorneys for Plaintiff**


Brian Ruschel (0046631)
925 Euclid Ave Ste 660
Cleveland OH 44115
telephone: 216-621-3370
facsimile: 216-621-3371
bruschel@aol.com


Mark Schlachet (0009881)
3637 South Green Road, 2nd Floor
Beachwood OH 44122
telephone: 216-896-0714
facsimile: 216-514-6406
mschlachet@clevelandnet.com


Raymond C. Zanney (0061510)
9425 Brookpark Road, 2nd Floor
Parma OH 44129
telephone: 216-739-2600
facsimile: 216-661-9292
Rzesq@cs.com
Of Counsel

## ENDORSEMENT FOR JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

_____
Murdock Goldenberg Schneider & Groh, LPA
Jeffrey S. Goldenberg (0063771)
Todd Naylor (0068388)
35 East Seventh Street, Suite 600
Cincinnati OH 45202-2012
Telephone: (513) 345-8291
Facsimile: (513) 345-8294
jgoldenberg@mgsglaw.com
tnaylor@mgsglaw.com
**Trial Attorneys for Plaintiff**